# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KAITLIN FRANKE,<br><br>  Plaintiff,<br><br>v.<br><br>TRUSTWAVE HOLDINGS, INC. and TRUSTWAVE SUBSIDIARY LLC,<br><br>  Defendants. | Case No.:<br><br><br><br>**COMPLAINT**<br><br><br>**JURY DEMANDED** |

Now comes the Plaintiff, KAITLIN FRANKE, by and through her attorneys, and for her Complaint against the Defendants, TRUSTWAVE HOLDINGS, INC. and TRUSTWAVE SUBSIDIARY LLC (collectively referred to as "Defendants"), Plaintiff alleges and states as follows:

## PRELIMINARY STATEMENT

1. This is an action for damages and equitable and injunctive relief for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

2. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants resides in this district and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

4. All conditions precedent to this Court's jurisdiction have occurred or have been complied with. Specifically:

      a.      Plaintiff filed a Charge of Discrimination, number 440-2020-06621, with the Equal Employment Opportunity Commission ("EEOC") on August 25, 2020.

      b.      The EEOC issued a Notice of Right to Sue to Plaintiff for said charge on August 27, 2020.

## PARTIES

5. Plaintiff is an individual who, at the time of the events described herein, resided in Chicago, Illinois.

6. On information and belief, Defendant Trustwave Holdings, Inc. is a corporation of the State of Delaware, which is registered with the Secretary of State to conduct business in Illinois, and whose principal place of business is located in Chicago, Illinois.

7. On information and belief, Defendant Trustwave Subsidiary LLC is a limited liability company of the State of Illinois, whose principal place of business is located in Chicago, Illinois.

8. Plaintiff and Defendants are "persons" as defined in 42 U.S.C. § 2000e(a).

9. Defendants are both an "employer" as that term is defined by 42 U.S.C. § 2000e(b), as, on information and belief, they engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

10. At all relevant times, Plaintiff was an "employee" as that term is defined by 42 U.S.C. § 2000e(f), as she was an individual who employed by Defendants, who are both an employer.

**BACKGROUND FACTS**

11. Plaintiff began her employment with Defendant during or about March 4, 2019.

12. Plaintiff's most recent position with Defendant was as an Enterprise Business Development Representative.

13. On or about April 29, 2019, during a week of sales meetings, Plaintiff attended a gathering with many of her co-workers at Kitty O'Shea's restaurant at the Hilton hotel in Chicago, Illinois.

14. During this event, Nathan Donaldson ("Donaldson"), a Canadian sales representative for Defendants, made several comments to Plaintiff about her chest and loudly proclaimed in front of many people that he and Plaintiff were going to "kiss or something" before the sales meetings ended that week.

15. The following day, Plaintiff reported Donaldson's actions to Defendants' Director of Sales, Michael Johnson, her manager, Pierre Jackson, and three other co-workers. These individuals advised Plaintiff to report the Donaldson's actions to Defendants' human resources department.

16. On or about May 2, 2019, Plaintiff reported Donaldson's actions to Defendants' Chief Human Resources Officer, Julie Nagle ("Nagle"). Nagle reprimanded Plaintiff for telling others about Donaldson's actions, telling Plaintiff that is how rumors are spread and reputations are ruined.

17. During or about June of 2019, Sergio Nesti ("Nesti"), a vice-president of sales engineering for Defendants with whom Plaintiff worked, advised Plaintiff that he had romantic feelings towards her.

18. Plaintiff rejected Nesti's advances, which led to harassing and retaliatory conduct by Nesti. The harassing and retaliatory conduct to which Plaintiff was subjected by Nesti included, but was not limited to, placing phone calls to Plaintiff at night, threatening to hurt Plaintiff, grabbing Plaintiff by the hair and neck, and threatening to get Plaintiff fired if she told anyone about his conduct.

19. On or about September 26, 2019, Plaintiff reported Nesti's conduct to her new manager, Lauren Gilyard ("Gilyard"). On information and belief, Gilyard escalated Plaintiff's report to her superiors, who ultimately reported the situation to representatives in Defendants' human resources department.

20. Plaintiff ultimately met with Defendants' human resources representative, Brian Sanderson, to whom she recounted the story of her interactions with Nesti.

21. Plaintiff was told by Sanderson not to tell anyone else about the situation with Nesti and to keep quiet about it.

22. During or about August 3-5, 2019, Plaintiff met another Canadian representative of Defendants, Bill Matichuk ("Matichuk"), during a training session.

23. Towards the end of that training session, Matichuk was leaving for the airport for his flight home, when he asked Plaintiff to accompany him into the hall to speak. Plaintiff declined, so Matichuk instead sent Plaintiff a message through Microsoft Teams. Matichuk's message said that he had to go and he had something he wanted to tell Plaintiff, but it would have to wait until they saw each other again at Defendants' Sales Kick Off in 2020.

24. After returning home, Matichuk contacted Plaintiff over Facebook and Instagram, sending Plaintiff several messages commenting on her looks, and sending Plaintiff pictures of people holding hands. Matichuk eventually began placing phone calls to Plaintiff at work.

25. During or about early October of 2019, Plaintiff met with Nagle and Sanderson, and told them about Matichuk's conduct towards her. Nagle and Sanderson encouraged Plaintiff to send Matichuk an email asking Matichuk to leave her alone.

26. During or about mid-October of 2019, Matichuk sent Plaintiff an email, saying that he was frustrated that Plaintiff was avoiding him. Plaintiff responded to Matichuk via email, asking Matichuk to leave her alone and explaining what Matichuk had done that was making her feel uncomfortable.

27. Approximately one week later, Plaintiff received an email from Matichuk's wife, asking Plaintiff to explain what was going on between Plaintiff and Matichuk.

28. Upon receiving the email from Matichuk's wife, Plaintiff sent an email to Sanderson and Gilyard, asking what she should do about this situation.

29. In response, Sanderson told Plaintiff not to talk with Matichuk's wife while Sanderson looked into the issue.

30. While Plaintiff was waiting to hear back from Sanderson, Matichuk's wife called Plaintiff several times, leaving voicemail messages asking Plaintiff for details about what had happened between Plaintiff and Matichuk, so that maybe she could divorce Matichuk.

31. Plaintiff later met with Sanderson to discuss the situation further. Sanderson told Plaintiff that he could not stop Plaintiff from returning Matichuk's wife's phone calls, but he advised Plaintiff not to call her. Sanderson also stated to Plaintiff that if Plaintiff said anything disparaging about Matichuk to Matichuk's wife, it could hurt the company.

32. During or about late October or early November of 2019, Plaintiff received either a voicemail message or an email message from Matichuk's wife, in which she stated that Matichuk had beat her and she was now living in her car.

33. Although Plaintiff did not want to get involved in a marital dispute between Matichuk and his wife, upon receiving this message from Matichuk's wife, Plaintiff felt bad for her and decided to call her back. When Plaintiff spoke with Matichuk's wife by phone, Matichuk's wife told Plaintiff that Matichuk was violent and dangerous, and asked Plaintiff to be careful around him. Plaintiff told Matichuk's wife that they did not work together and they were not located in the same country. Plaintiff also told Matichuk's wife that they had met at a new hire training session, and that Matichuk then sent Plaintiff some things that made Plaintiff uncomfortable. Plaintiff refused to provide any further information to Matichuk's wife because she did not want to disparage Matichuk's character, for fear of hurting the company. Plaintiff told Matichuk's wife that any other details she was willing to divulge were included in the email she had sent to Matichuk, as set forth above.

34. Shortly thereafter, Plaintiff told Gilyard about her conversation with Matichuk's wife. On information and belief, Gilyard then told other members of their workgroup not to accept any requests from Matichuk to connect with them on social media.

35. On information and belief, Matichuk contacted representatives in Defendants' human resources department and advised them about Plaintiff's conversation with his wife.

36. During or about mid-November of 2019, Sanderson asked Plaintiff to sign a document stating that if she contacted Matichuk or his wife again, her employment would be terminated.

37. Thereafter, Matichuk and his wife repeatedly attempted to contact Plaintiff via phone calls, emails, and social media messages. However, Plaintiff did not respond to them and had no further contact with either of them.

38. On information and belief, Gilyard also discussed the situation described above between Plaintiff and Matichuk with representatives of Defendants' human resources department. Thereafter, Gilyard told Plaintiff that Plaintiff was "on thin ice with HR" and that Plaintiff should stop putting herself in situations where Plaintiff was getting harassed by other male employees of Defendants.

39. After Defendants' holiday party in December of 2019, Plaintiff attended a gathering with her co-workers. During this gathering, another unknown male employee of Defendants groped Plaintiff, put his arms around Plaintiff, and grabbed Plaintiff's buttocks several times. Eventually his conduct ceased after several warnings and requests from Plaintiff.

40. Plaintiff later gave Gilyard a vague description of that evening's events, because she wanted Gilyard to know that she could handle herself. Plaintiff did this because she hoped Gilyard would select her to attend the upcoming RSA Conference.

41. Plaintiff was hoping to attend the RSA Conference to advance her career, as it would give her the opportunity to learn a great deal of industry related information, meet cybersecurity professionals from around the world, represent Defendants at their vendor booth, and participate in selling Defendants' products and services.

42. On or about Friday, January 17, 2020, Plaintiff attended a meeting with Gilyard, during which Gilyard advised Plaintiff that she was not chosen to attend the RSA Conference and represent their team. Plaintiff expressed her frustration to Gilyard, reminding Gilyard that she was vastly more knowledgeable than anyone else on their team about Defendants' technology and solutions, that she knew more about cyber security than others on their team, and that she had more tenure and sales experience than anyone else on their team. Gilyard advised Plaintiff that representatives in Defendants' human resources department had blocked Plaintiff from attending

the RSA Conference because they believed Plaintiff was too much of a liability. Plaintiff then explained to Gilyard in more detail what had happened after the company holiday party, as described above.

43. On or about Monday, January 20, 2020, which was Plaintiff's birthday, Plaintiff arrived at work to find a note on her desk from Gilyard, telling Plaintiff that Gilyard was proud of all the progress Plaintiff had made.

44. Later that same day, Defendants terminated Plaintiff's employment.

## COUNT I
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## DUE TO DISCRIMINATION

45. Plaintiff incorporates all of the allegations and statements made in paragraphs 1 through 44 above as if fully reiterated herein.

46. Defendants, in violation of 42 U.S.C. § 2000e, *et seq.*, have denied and continue to deny Plaintiff an equal opportunity for employment due to her sex, female.

47. During Plaintiff's employment with Defendants, she was subjected to severe, pervasive, hostile, abusive, and unwelcome sexual harassment, which altered the terms and conditions of her employment.

48. The discriminatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances described above. All of the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendants.

49. Defendants, through their employees, agents, and/or authorized representatives, knew that their harassment and discriminatory treatment of Plaintiff, and their termination of Plaintiff's employment, violated Title VII.

50. This is a proceeding for declaratory judgment as to Plaintiff's right of a permanent injunction restraining Defendants from maintaining a policy, practice, usage, or custom of discriminating against Plaintiff because of her sex with respect to compensation, terms, conditions, and/or privileges of employment, depriving Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee, because of her sex. This Complaint also seeks restitution to Plaintiff for the denial of all of her rights, privileges, benefits, and income that would have been received by her but for Defendants' unlawful and illegal discriminatory acts and practices.

51. Plaintiff has no plain, adequate, or complete remedy at law to address the wrongs alleged herein, and injunctive relief is her only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendants' policy, practice, custom, and usage as set forth herein, unless and until it is enjoined by the Court.

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## DUE TO RETALIATION

52. Plaintiff incorporates all of the allegations and statements made in paragraphs 1 through 51 above as if fully reiterated herein.

53. Defendants, in violation of 42 U.S.C. § 2000e, *et seq.*, have denied and continue to deny Plaintiff an equal opportunity for employment in retaliation for engaging in protected activities and for complaining about the discrimination and sexual harassment against her.

54. During Plaintiff's employment with Defendants and when Plaintiff was terminated by Defendants, she was subjected to discrimination and retaliation for engaging in protected activities, as set forth above.

55. The retaliatory treatment to which Plaintiff was subjected includes, but is not limited to, the instances alleged above. All of the actions of the individuals described herein were undertaken in their capacities as the employees, agents, and/or authorized representatives of Defendants.

56. Defendants, through their employees, agents, and/or authorized representatives, knew that their harassment and discriminatory treatment of Plaintiff, their termination of Plaintiff's employment, and their retaliation against Plaintiff for engaging in protected activities and for complaining about sexual harassment, violated Title VII.

57. This is a proceeding for declaratory judgment as to Plaintiff's right of a permanent injunction restraining Defendants from maintaining a policy, practice, usage, or custom of retaliating against Plaintiff for engaging in protected activities and for complaining about sexual harassment, with respect to compensation, terms, conditions, and/or privileges of employment, depriving Plaintiff of equal employment opportunities and otherwise adversely affecting her status as an employee for engaging in protected activities and because of her complaints about sexual harassment. This Complaint also seeks restitution to Plaintiff for the denial of all of her rights, privileges, benefits and income that would have been received by her but for Defendants' unlawful and illegal retaliatory acts and practices.

58. Plaintiff has no plain, adequate, or complete remedy at law to address the wrongs alleged herein, and injunctive relief is her only means of securing adequate relief. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendants' policy, practice, custom, and usage as set forth herein, unless and until it is enjoined by the Court.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, KAITLIN FRANKE, respectfully prays this Honorable Court enter judgment against Defendants, TRUSTWAVE HOLDINGS, INC. and TRUSTWAVE SUBSIDIARY LLC, as follows:

a. Declaring Defendants' practices complained of herein unlawful and in violation of Title VII;

b. Permanently enjoining Defendants, their agents, successors, officers, employees, representatives, attorneys, and those acting in concert with them from engaging in the unlawful practices, policies, customs, and usages set forth herein, and from continuing any and all practices shown to be in violation of applicable law;

c. Ordering modification or elimination of the practices, policies, customs, and usages set forth herein and all other such practices shown to be in violation of applicable law, ensuring Defendants will not continue to engage in sexual harassment, discriminate on the basis of sex, or retaliate against employees for engaging in protected activities;

d. Immediately assigning Plaintiff to the position she would now be occupying but for the discriminatory and/or retaliatory practices of Defendants, and adjusting the wage rates, salaries, bonuses, and benefits for Plaintiff to those which she would have received but for the discriminatory and/or retaliatory practices of Defendants, or awarding Plaintiff front-end and future pay;

11

e. Compensating and making Plaintiff whole for all earnings, wages, bonuses, and other benefits that Plaintiff would have received but for the discriminatory and/or retaliatory practices of Defendants;

f. Compensating and making Plaintiff whole for all other damages Plaintiff incurred as a result of the discriminatory and/or retaliatory practices of Defendants;

g. Awarding Plaintiff all witness fees, court costs, and other litigation costs incurred in this Action, including reasonable attorneys' fees;

h. Awarding Plaintiff compensatory, liquidated, and/or punitive damages as allowed by applicable law; and

i. Granting such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues in this action so triable, except for any issues relating to the amount of attorneys' fees and litigation costs to be awarded should Plaintiff prevail on any of her claims in this action.

RESPECTFULLY SUBMITTED,

KAITLIN FRANKE

By: /s/ David B. Levin
Attorney for Plaintiff
Illinois Attorney No. 6212141
Law Offices of Todd M. Friedman, P.C.
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Phone: (224) 218-0882
Fax: (866) 633-0228
dlevin@toddflaw.com

12